Case number 16-3459 Stephanie Watson v. The Ohio Department of Rehabilitation and Corrections Arguments not to exceed 15 minutes preside. And Mr. Close, for the appellant, you may proceed. If it please the court, I would like to reserve five minutes for rebuttal. If it also please this honorable court, this is essentially a case about failure to hire, although there are significantly more components that have been briefed, which started out as my client, Stephanie Watson, working for the Adult Parole Authority. A little bit of a background about Ms. Watson and the failure to hire has to do with her applications for teaching positions. Ms. Watson is an African American female. She was 56 at the time that this started in 2010. She has a Juris Doctorate degree. She is licensed to practice in two states. She has a Masters in Education, Bachelors in Education, Principal's License, a Superintendent Intern Credentials, and Impeccable Teaching Credentials for over a period of 15 to 20 years. She was hired at the APA in 2010 and underwent some adverse treatment there and was eventually probationarily removed. How do you react to this perspective on the case? Let's just say for the sake of argument, prima facie case is established for every claim. Let's say for the sake of argument, there's not an exhaustion issue, just for the sake of argument. You still have to get through that last hurdle that once the states come forward with its explanations for its decisions, you've got to show that it was pretextual and not a legitimate reason. So if you just jump through everything else and just go to that, how do you answer that problem? What's your evidence that shows that the state's explanations are pretextual, made up, not based in reality, and so forth? In my memo contra to summary judgment and incorporated by reference to this court, the plaintiff's affidavit of 19 pages listed 18 specific items regarding her application. So I'll tell you, a common way this particular issue, this defense is dealt with, is by showing other people that, for example, were just like her, but for sake of argument, white, but treated differently. Do you have that kind of a? Yes. So where would I look for that? What are those examples and who are they? Well, in my brief and in my reply. Well, just tell me. Right here. I'll write it down. I'll write it down. Eric Sotosante, for instance. Okay. Male, white. He had filled out an application, was evaluated for the same position as for two, literally back to back. In one application process, he was scored 10 points by the examining subject matter expert. In the next application, with the exact same resume, exact same information, was scored 14 points. The point scoring is very important because other than meeting an initial threshold for qualification, minimum qualifications, it's the points that get you an interview for the position. So that's a very important threshold. For instance, Megan Zettel, white, female. She was credited by Trent Patterson, who is a male, white subject matter expert, with four hours per week. And that four hours per week was counted as nine months of experience because she worked it for nine months. She was also credited for six hours a week for one year and seven months working experience. Help me. I feel I'm being a little slow here, but just help me. Explain to me where the differential treatment is, why this person was just like her, didn't have the same problems that the state identified with respect to her. Yes, Ms. Watson was not given credit for a significant amount of time that she had listed on her resume regarding tutorial experience and experience teaching in other institutions that were deemed either not relevant by the subject matter expert or not calculable to the extent that they were part-time. And for these people that I'm talking about, all of them received a significant amount of credit for significantly part-time accomplishments. For instance, and the most glaring example of that is Mr. Ryan Beardsley, who was given educational credit of 11 years for his having worked one day a month as a test proctor from 1999 to 2010. And for that, he earned 11 years of experience. That experience, again, goes to the rating, whether or not somebody gets an interview, and experiences considered by the people who are the appointing panel. So when you're giving somebody who walks in and literally is a hall proctor, for lack of a better term, for one day a month on a Saturday, 11 years of teaching experience, and you don't give Ms. Watson, and he's male white by the way, and you don't give Ms. Watson any credit at all for 20 hours a week in individual tutoring, then I think that's the definition of disparate treatment. And we have example after example after example of that kind of level of failure by the subject matter experts to engage in a reasonable process. There are other issues also as well as that disparate treatment that go to the issue of whether or not the process itself was fair. For instance, Mr. Trent Patterson testified that he looked at each and every one of the certifications of individuals who were giving an application and made sure that they were certified. Well, in the plaintiff's affidavit, we have the example that Mr. Patterson scored Mr. William Bazell, a male white, for 14 points, and that goes to whether or not he was interviewed. Well, Mr. Bazell was a convicted felon who had no teaching credentials, and had surrendered his teaching credentials, and was released for prison just two weeks before his application. That type of process goes to the issue of whether or not not only of disparate treatment of hiring people that have no qualifications whatsoever for a position, all the way to whether or not it creates pretext on the part of this whole process. Because case law is fairly clear on that, that you can take examples of contradiction, misstatement of an individual's qualifications. In assessing all this, what do you do about her background when she had these problems in prior employment here? I mean, so why wouldn't that explain why she would be treated differently from some of these other folks? Because they're not related at all to teaching credentials. But, I mean, one could say she had a history of insubordination in her prior position, not following the dress code, refusing to attend a firearms training. Why isn't that something that makes her different from some of the applicants that you're pointing to? We have no evidence that other than the one position to which she was appointed and selected by Mr. Patterson, that any of the appointing authorities or any of the subject matter experts in resolving that had any awareness of any misconduct on her, alleged misconduct on her part or insubordination from anyone. The obligation to show similarly situated persons that are treated differently, isn't that objective as opposed to whether a particular hiring person subjectively knew about certain things in their past? Yes, similarly situated would be part of showing disparate treatment. There is no evidence before the court nor did the appellee bring forward any evidence that any of the subject matter experts had any knowledge that she was engaged in any type of conduct that would prohibit her in any fashion from being selected a candidate for that position. There's simply nothing in the record that indicates that. In fact, they've gone to great lengths to try to persuade this court that none of these people knew anything at all about any EEO activity, which clearly the first EEO charge made allegations regarding the conduct she received at the APA. So given that, I don't see where there's any evidence that any of the subject matter experts in qualifying Ms. Watson or the appointing authorities making the selection had any knowledge except for one. Thank you. Thank you, counsel. May it please the court, my name is Joseph Rosenthal and I represent the Department of Rehabilitation and Correction. I will kind of jump in at what's going to be sort of the end of my argument, but to the extent this court requested information about pretext, I'd like to point out three very poignant examples of why Ms. Watson's argument that the system of selecting candidates for the teacher positions for which she applied for was imbued with some discriminatory animus and the cards were stacked against her. Ms. Watson overlooks the fact that the very hiring process that she says discriminated against her on the basis of race and sex and retaliation, that's the hiring process that was used in selecting her for the position at the APA, the Adult Parole Authority, which is a division of the Department of Corrections in 2010. As you know, she was probationary removed after 50 days for insubordination. It's the same hiring process that was used to give her enough points by the subject matter screeners. Mr. Close seems to argue that there were wide-ranging discrepancies in some of the isolated instances between candidates. Well, the fact remains that she got interviews for over half of the 20 positions that are at issue here. That's a pretty good percentage, I believe. Nobody questioned her degrees and that type of thing. Moreover, the third thing she overlooks is the same hiring process whereby she says discriminates against her is where the interview panelists for the job at the Southern Ohio Correctional Facility, which is a maximum security institution, the interview panelists there, which included, I believe, Trent Patterson, whose name was mentioned today, recommended her for the position of Teacher 1 over all the other candidates. She never did get the position, but I think it's very clear from the record that it was not for a discriminatory reason. There had been a contingent offer given to Ms. Watson, and it was made clear to her that was subject to a background check. And it was not until this background check was pending that the warden, Warden Morgan, learned of the fact that she was probationary removed from the pro-officer position at the APA for insubordination after a very short period of time. It was then and only then that her contingent offer was pulled. Did these decision-makers know about the insubordination? Mr. Morgan knew about the insubordination. So the decision-makers knew. Someone who was involved in the decision-making knew. For this instance, yes. The failure to hire claim. Yes, the Teacher 1 position at the Southern Ohio Correctional Facility. They, Mr. Morgan, determined after, subsequent to the offer being made, the contingent offer, her background check was pending. And it is then he learned, I believe, from information that Ms. Watson herself filled out during a form that she filled out prior to her interview at the Southern Ohio Correctional Facility. It's more explicitly set forth in his declaration, however, that once he learned of this, I think it's reasonable to understand that a warden of a maximum security prison did not want the hassle of contending with a person, at least, who at one point had been insubordinate in another division of the department. And that's when he pulled his... But the members of the panel who initially recommended her were not aware of the insubordination. That's correct. And I think that's important. They didn't use anything – well, they didn't know that – moreover, they didn't know that she filed charges of discrimination. They didn't know that she had filed a lawsuit because some of these interviews were taking place during the pendency of this lawsuit. They looked at it. As you know, subjectivity is a very acceptable thing that can be taken into consideration as factors as opposed to, as Mr. Close would argue, the lack of uniformity in some of the scores. Things like personality, reputation, networking abilities, passion, and general performance in the interview can all be taken into consideration. These have been accepted qualities that are of a subjective nature that this court has considered and accepted. And also, the appointing authorities for all the institutions, including initially Warden Morgan, they accepted the recommendations of the panel for all these positions. And it wasn't Ms. Watson except in the first – that one instance initially at the Southern Ohio Correctional Facility. But what's your answer to your friend's point about scoring employment experience? It sounded like a white male who's getting a lot more credit than he seemed to deserve in relation. There is – there are – those are not inaccurate. Those are reflected, I believe, in the record, those scores. But the fact remains that she still got an interview. And it was – it is, like I said, it's subjective qualities that determine things maybe ultimately. And this court has also, as far as disparity in assigning points or checking off a list, this court has decided in the past that it's not the province of this court to weigh – my argument would be it wouldn't be the province of this court to weigh through thousands of pages of applications to look at scoring and look at scoring sheets to determine if Ms. Watson's contention that she should have scored higher in one particular instance or another out of 20 positions, that is not – the court is not a super human resources department. And moreover, Ms. Watson has not come forward with any evidence whatsoever that the standard procedure followed in all these cases was not followed in a non-discriminatory way. As I stated, I believe, as the warden did not know of any of the protected activity or her race when they made the decisions, so too the interview panelists did not know that she had filed prior charges of discrimination or lawsuits. And they obviously – she was obviously picked for those interviews. If you're right about these pretext arguments and there being a lack of pretext, do you agree we don't have to deal with the exhaustion issues? I think it is our view that the pretext, although it's at the end of our brief, the pretext would – even if you said there was exhaustion and even if you said she made prima facie a case, even if you said she did not waive her removal claims because they weren't mentioned except in a brief allusion to them in the fact statement, they weren't listed as an issue or they weren't argued, the department's contention would be that you could go right to pretext and say, even if you meet all these other hurdles, that you would not be able to overcome the pretext. That is kind of the linchpin, even if she makes it that far. And I'd just like to point out one other – if I may briefly indulge you with the exhaustion argument. The only – it's kind of interesting – the only two positions that were ever set forth or referenced in the charges of discrimination was the one from Southern Ohio Correctional Facility and one from Trumbo Correctional Facility. And nonetheless, those are the two that were not included as claims be remained. Mr. Close, Ms. Watson, filed a voluntary dismissal in that – for Job 9 and Job 17. She was represented by counsel, and when they realized that they had dismissed them, they just – they're asking this court to invoke equitable tolling. Well, that is not a ground to invoke equitable tolling. This court has found that very few factors, including lack of actual or constructive knowledge of the issuance of a right-to-sue letter, the party's diligence in pursuing the rights, prejudice to the defendant, or reasonableness of the party's ignorance – none of these factors were addressed. And these – these are the two charges that were explicitly set forth. The only two charges – the only two claims that were set forth in the charges of discrimination. And I would just like to call your attention to, as you know, this court decided the Clark case versus Nissan Motor Manufacturing Company. It's almost on all fours in comparison with Ms. Watson's case. The plaintiff in that case was represented by counsel, they voluntarily dismissed, and they attempted to refile within a year. The only difference there was that DRC, Department of Correction, did not know that Ms. Watson wanted to refile. Nissan did, but the court determined – this court determined in that case, just because the person or the plaintiff did not intend to dismiss Ms. Watson, being represented by counsel and the other factors that I listed, did not toll the 90-day time to file a claim in a complaint itself. I don't want to belabor any of the other exhaustion remedies unless this court has any other questions about them. I think we do not. Thank you, counsel. Thank you, Your Honors. Returning to the issue of pretext regarding the process itself, the interview, which Mr. Patterson testified was the highest percentage – a very high percentage, to use his exact words – of the process. Certainly would be looked at to see if there was any pretext. Well, in this case, there is absolutely no objective information at all that can be attributed to the interview process. There is no precursor questions that are formulated that are exemplars to provide examples of pretext. There is no rating of any kind of the answers as to whether or not they fulfill answering the question. There are merely notations of what the answer is on the page and nothing further. There is absolutely no objectivity whatsoever. There would be no way under any reasonable form of human resources development for a position that you could go back and look at that particular information and reconstruct. Not that interviews are subjective. Does that get you to a jury trial? I mean, I don't know that that by itself shows pretext. It does when the qualifications of the candidate so far outweigh the qualifications of the selected appointee that the interview plays a significant part in the process. And you can't point to that interview and say, here is why we selected this person on the basis of objectivity. For instance, the law is fairly clear in terms of what a jury gets to hear. A.K.A. versus Washington Hospital, which was quoted in Philbrick in this court in 2006, says the following. In a closed case, a reasonable juror would usually assume an employer is more than capable of assessing the significance of small differences in the qualifications of candidates, or that the employer simply made a judgment call. But this does not mean that a reasonable juror would in every case defer to the employee assessment. If that were so, no discrimination case would ever go to trial. Now, again, a person regarding pretext, Blair Terpstra. Blair Terpstra was given a total of four points for all of the experience. There was no education, correction, the education was four points. There was no work experience whatsoever. There was part-time sub for 11 months. With those four points, and then an interview by Mr. Patterson, and an interview of Ms. Watson, who scored 14 points for the same position, with that, he was given the position. I asked Mr. Patterson at that position, how is it that somebody who scores 14 points can overcome someone who only scored four points and has no work experience? And his response was basically twofold. Number one, if it all depended on experience, we'd never have a job. And number two, based on his passion. And I asked, well, how do you measure passion? And his response was, you really can't. So I hate to break it to you, but I use it all the time when I interview for clerks. Well, I understand that passion is a component of a position, but I asked him, how does passion outweigh, objectively, in some fashion, how does it outweigh the qualifications of Ms. Watson, who, by his own determination, knows that she has a Juris Doctorate, knows that she has a Master's in Education, knows that she has a Principal's License, knows that she has a Superintendent Intern's position filled. Is that really a legal question that we're supposed to answer? How passion outweighs or how the qualifications outweigh passion? Are we authorized to answer that and hold somebody liable? Yes. Because that's the reason that the defendant gave for the choice of their selected applicant. It would seem like a choice that an employer is fully entitled to make. They can say they value passion more than having a certain degree, particularly if you're not practicing in the field of that degree. And I would defer back then to ACCA versus Washington. In this case, with those types of qualifications, and the law is also clear with regard to that. Okay. Thank you. Thank you.